**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| DALLAS FALLEN OFFICER FOUNDATION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. |
| FREDERICK FRAZIER, DPA's ASSIST THE OFFICER FOUNDATION, INC., and DALLAS POLICE ASSOCIATION, | § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff the Dallas Fallen Officer Foundation files this Original Complaint against Defendants Frederick Frazier, DPA's Assist the Officer Foundation, Inc. (the "ATO"), and the Dallas Police Association (the "DPA"), as follows:

**PARTIES**

1.      Plaintiff Dallas Fallen Officer Foundation is a Texas nonprofit corporation.

2.      The ATO and the DPA are Texas nonprofit corporations with their principal places of business in Texas.

3.      Frederick Frazier is an individual residing in Collin County, Texas. He serves as the Chairman of the ATO and First Vice President of the DPA.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over the subject matter of this dispute at least pursuant to 28 U.S.C. § 1331, as the Fallen Officer Foundation has asserted claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et. seq.* The

Court has jurisdiction over the Fallen Officer Foundation's other claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the RICO claims that they form part of the same case or controversy under Article III of the United States Constitution.

5.      This Court has personal jurisdiction over Defendants because the ATO and the DPA have principal places of business in Texas, and Frazier is a Texas resident.

6.      Venue is proper over the Fallen Officer Foundation's claims at least pursuant to 28 U.S.C. § 1391(b)(1) because Frazier resides in this District and the ATO and the DPA are residents of Texas and are subject to personal jurisdiction in this District. The Court also has venue over the Fallen Officer Foundation's RICO claim pursuant to 18 U.S.C. § 1965(a), as Frazier resides in this District, he is an agent of the ATO and the DPA, and all Defendants have transacted affairs in this District.

## FACTUAL BACKGROUND

I.      **The Fallen Officer Foundation mobilized to help raise donations for the families of the fallen officers murdered on July 7, 2016.**

7.      The Fallen Officer Foundation is a 501(c)(3) police support organization whose purpose is to assist the families of police officers killed or seriously injured in the line of duty.

8.      Immediately after the July 7, 2016 sniper attack in downtown Dallas the Fallen Officer Foundation mobilized to help raise charitable donations for the families of the officers murdered and injured during the tragic incident.

9.      The Fallen Officer Foundation was one of three charitable organizations to whom the Dallas Police Department directed the public to donate following the July 7 tragedy.

II.      **Frazier and the DPA try to eliminate the Fallen Officer Foundation.**

10.     The ATO is another charitable organization whose stated purpose is to provide assistance to the families of officers whose lives are lost in the line of duty. The ATO is an arm of

the DPA; for example, they share offices and are managed by some of the same individuals, including Defendant Frazier. Frazier and the DPA effectively control the ATO.

11. For years Frazier has held leadership roles within the DPA and the ATO. Beginning in 2014, Frazier and others embarked on a scheme to expand their power within and outside Texas by affiliating the DPA and the ATO with an organization known as the Fraternal Order of Police ("FOP"), the largest law enforcement professional organization in the country.[1] But Frazier and his associates had a complication: The FOP had already awarded a Dallas lodge—Lodge #588, numbered in memory of the five Dallas police officers who were killed in the line of duty in 1988.

12. Because a local FOP lodge already existed, Frazier and his colleagues decided to attempt to convince Dallas Fraternal Order of Police #588 to merge with the DPA. But there was considerable opposition within Lodge #588 to a merger with the DPA. In furtherance of their scheme, Frazier therefore regularly attended meetings of Lodge #588 to gin up support for the merger he sought.

13. At one such meeting, in December 2015, Frazier revealed one purpose of the Lodge #588-DPA merger he and his associates sought: to eliminate the Fallen Officer Foundation. At that meeting, Frazier confronted a representative of the Fallen Officer Foundation. Frazier complained the Fallen Officer Foundation had even been formed in the first place, when the DPA already had the ATO; Frazier's mindset was the ATO should have a monopoly over charitable fundraising for fallen officers. And he told everyone that once Lodge #588 merged with the DPA, the DPA would take over and eliminate the Fallen Officer Foundation. The Fallen Officer Foundation representative told Frazier the Fallen Officer Foundation was independent of Lodge #588—unlike

---

[1] The FOP has more than 330,000 members in more than 2,200 lodges throughout the U.S.

the ATO's relationship to the DPA—and no one was taking it over. Frazier then slandered the Fallen Officer Foundation, claiming it was making money off the backs of dead officers.

14.     In the following years, Frazier and his co-conspirators were never able to convince Lodge #588 to merge with the DPA. And they were not able to "take over" the Fallen Officer Foundation. But from that point forward, the ATO's leadership went out of their way to injure the Fallen Officer Foundation and harass its leadership.

### III.     Frazier and the ATO promise to disburse donations taken from mail seized by the City expeditiously and without restriction.

15.     The July 7, 2016 ambush was the deadliest incident for law enforcement officers in the U.S. since the September 11, 2001 attacks. In the immediate aftermath of the July 7 attack, Frazier, the ATO, and the DPA once again saw an opportunity to increase their state-wide and national power. And Frazier immediately sought to position the ATO as the preferred charity to which the City of Dallas and others directed concerned citizens.

16.     To that end, within a few weeks after the July 7 attack, Frazier began discussions with the City regarding entering into an illegal contract whereby the City would intercept and deliver mail to the ATO for the purpose of the ATO opening, reading, and depositing any donations it found within the mail into the ATO's bank account, regardless of who the donations were for. Those donations included cash, gift cards, and checks.

17.     In negotiations leading to the illegal contract, the ATO notably requested the City to remove language in drafts that would have contractually entitled the City to audit the ATO's handling of seized donations. Incredibly, the City went along with the ATO's request. In hindsight, the ATO's insistence that it be protected against an audit should have been a red-flag evidencing its bad faith intentions.

18.     The ATO's clandestine discussions and negotiations with the City ultimately led to the ATO and the City entering into a contract, labeled a "Donations Management Agreement", Administrative Action No. 16680, which states it has an effective date of October 21, 2016 (the "Donations Management Agreement").

19.     Under the Donations Management Agreement, the ATO and the City agreed the City would intercept and then deliver mail to the ATO without the knowledge or consent of those to whom the donations were directed. The ATO and the City also agreed the ATO would deposit any donations found within such mail into the ATO's bank account, regardless of whether the ATO had a legal right to do so.

20.     The Donations Management Agreement stated, "in response to the shootings in Dallas, Texas on July 7, 2016, the City has received numerous donations intended for the families of the . . . slain . . . officers," and "the donated funds ('Funds') shall not be deposited into City accounts, but immediately turned over to [the ATO] as detailed herein to avoid any delay in disbursing the Funds to the Officers." The Donations Management Agreement required the ATO to disburse any donations contained in the seized mail without restriction or delay.

21.     But at the time Frazier signed the Donations Management Agreement, he had no intention of allowing the ATO to comply with its terms. For example, he had already decided at that time that rather than quickly disbursing the donations collected from the seized mail, the ATO would commingle those donations with other funds obtained by the ATO and only disburse them to the families of the fallen officers upon their acquiescence to the ATO's self-imposed restrictions on their use. For political reasons, and in furtherance of their effort to increase their state-wide and national power, Frazier and his associates sought to create the largest single, commingled "kitty"

possible so they could engage in self-aggrandizing. Frazier, the ATO, and the DPA sought to act in their own self-interest, rather than in the best interests of the families of the five fallen officers.

22.     The City relied on Frazier and the ATO's commitment to comply with the Donations Management Agreement—including the promise to expeditiously disburse donations—in entrusting the ATO with the public's generous donations.

## IV.   Defendants steal donations sent to the Fallen Officer Foundation and families of the five fallen officers.

23.     The ATO recovered the seized mail from the City and held it at the DPA's headquarters for processing under the Donations Management Agreement. The ATO processed the seized mail over a period of weeks and deposited checks and cash it took from the mail in its own bank account on December 16, 2016.

24.     Among the hundreds of check donations seized by the ATO, many were made payable by donors directly to the Fallen Officer Foundation and the families of the five officers murdered in the July 7 attack. These donations were made by churches, veterans organizations, other law enforcement-related charities, and individuals from all over the United States, including Collin County, Texas.

25.     The ATO deposited these Fallen Officer Foundation donations in its own bank account, without the Fallen Officer Foundation's knowledge or permission, and without the knowledge or permission of the Fallen Officer Foundation's donors. The ATO could and should have contacted the Fallen Officer Foundation regarding these donations, but it did not. The ATO could have contacted the donors who directed their generous donations to the Fallen Officer Foundation, but it did not.

26.     The ATO also unlawfully deposited donations directed to families of the five fallen officers. Again, the ATO misappropriated these donations without the families' and donors'

knowledge or consent. The ATO could and should have contacted the families regarding these donations or the generous donors themselves, but it did not. It kept them for its own use.

27.     Notably, out of the hundreds of check donations the ATO seized and took control of, only 11 were actually intended for the ATO—fewer than the total number of donations the ATO stole from the Fallen Officer Foundation in 2016.

28.     In February 2018, the ATO acknowledged that 35 donations to the Fallen Officer Donation, including donations the ATO seized from the mail, were improperly deposited in its bank account.

29.     The aggregate value of the check donations misappropriated by the ATO, drawn on bank accounts outside the state of Texas, and belonging to the Fallen Officer Foundation and the families of the five fallen exceeded $5,000.

30.     The ATO's eventual deposit of donations directed to the Fallen Officer Foundation was unlawful in the first place, but it also failed to comply with Donation Management Agreement's requirement to expeditiously disburse donations it intercepted through the mail.

**V.     The ATO concealed its theft for more than eighteen months.**

31.     The ATO stole the Fallen Officer Foundation donations in 2016 but failed to own-up to its misappropriation until 2018. And it did not disclose its misappropriation until after it had been caught.

32.     By December 2017, the ATO's own bank, where the stolen Fallen Officer Foundation donations were deposited, had become so concerned with the ATO's actions that it commissioned its own independent audit of donations deposited into the ATO's account. The audit revealed not only that the ATO deposited numerous donation checks written to the Fallen Officer Foundation into its own bank account, but also that the Fallen Officer Foundation was not the only

victim of the ATO's theft. On information and belief, as a result of that audit, the ATO's bank confronted the ATO and demanded it return donations it had illegally deposited to their rightful owners, including the Fallen Officer Foundation.

33.    Before the ATO deposited the Fallen Officer donations it took from the mail in December 2016, it reviewed all of the check donations, and knew they were made payable to the Fallen Officer Foundation. Each and every Fallen Officer Foundation donation that the ATO took was stamped by the ATO "FOR DEPOSIT ONLY" to its own bank account prior to depositing with its bank. At that time the ATO claimed ownership of those donations by stamping "FOR DEPOSIT ONLY", it knew it had no right to any Fallen Officer Foundation donations.

34.    And even after the ATO deposited the donations stolen from the Fallen Officer Foundation, it continued to conceal its misappropriation from the Fallen Officer Foundation. For example, in connection with the Donations Management Agreement, the ATO promised the City it would provide a log no later than January 2017 detailing the donations it unlawfully seized and stole. The log was to include:

(a) the amount of the donations;

(b) the form of the donation (cash, check etc.), and check or tracking number, if any;

(c) the donor's name and address;

(d) the donor's designation for the funds;

(e) copies of all cancelled checks; and

(f) copies of bank reconciliation statements for the accounts the funds were deposited in.

While the ATO completely ignored its promise to the City, a third party investigating the ATO, among others, asked the City for a copy of this log. It was only then that the City remembered the ATO's promises and compelled the ATO to comply with its disclosure obligation. The ATO's

insistence to the City that it not be audited combined with its failure to comply with its obligation to report to the City reveal the ATO's bad faith.

35.    In June 2017, the ATO finally submitted to the City a report, signed by Frazier, purporting to comply with its disclosure obligations under the Donations Management Agreement. The "report" signed by Frazier claims 271 checks were included in the mail seized by the City and given to the ATO. The report signed by Frazier includes a copy of every check cashed by the ATO, and the front-side of every check was redacted by the ATO to remove certain donor account information. The ATO knew when it was redacting these check donations that any donation to the Fallen Officer Foundation was not a donation intended for the ATO—that any such donation belonged to the Fallen Officer Foundation, the charity it had been seeking to take over and eliminate.

36.    The report signed by Frazier included copies of checks made payable by donors to the Fallen Officer Foundation, including checks donated from outside Texas. The report signed by Frazier also included copies of checks made payable by donors directly to the families of the five fallen. These checks were also donated by individuals, churches, and charities residing within this District, and outside Texas.

37.    The report signed by Frazier included a spreadsheet created by the ATO noting that some of these donations were made payable to beneficiaries other than the ATO. For example, in one such entry, the ATO wrote, "check made payable to Katrina Ahrens". The ATO did not give this donation to Katrina Ahrens when it acquired the donation, and it has continued to withhold the donation from Katrina Ahrens even after it noted in the report signed by Frazier that the donation was made payable to her. The ATO should have notified Ahrens or the donors about misappropriated donations such as this, but it did not.

38.     The report signed by Frazier shows that the ATO seized and diverted donations made by more than 50 donors throughout the United States that were directed to the Fallen Officer Foundation and the families of the five fallen officers.

39.     On or about January 31, 2018, after it had been caught by its bank, the ATO finally contacted the Fallen Officer Foundation to notify it about the stolen donations and to arrange to return them to the Fallen Officer Foundation. While the ATO did eventually deliver two checks to the Fallen Officer Foundation for the face value of donations it stole, it made no effort to compensate the Fallen Officer Foundation for other injuries caused by its misconduct.

**VI.     The ATO's pattern of misconduct has extended over years.**

40.     The ATO's pattern of misconduct is not limited to taking donations out of mail it acquired through the Donations Management Agreement. It began well before that agreement was signed and continues to occur.

41.     For example, the ATO's 2018 disclosure to the Fallen Officer Foundation of donations it had misappropriated in 2016 included donations it obtained from sources other than the seized mail. The December 16, 2016 ATO deposit was for donations seized from mail, but the ATO deposited donations made to the Fallen Officer Foundation on at least five other occasions beginning August 2, 2016. The ATO first misappropriated a donation made to the Fallen Officer Foundation at least as early as August 2016. In August 2016 alone, the ATO deposited more than 20 check donations into its own bank account that belonged to the Fallen Officer Foundation. The Fallen Officer Foundation has confirmed the ATO continued to illegally deposit checks belonging to the Fallen Officer Foundation in September, October, November, and December 2016. In each case, as with the donations seized from the mail, the check was unlawfully stamped by the ATO prior to being deposited in its bank account. And the ATO did not notify the Fallen Officer Foundation or any donors that it had acquired control of Fallen Officer Foundation donations.

42.     Defendants have also lied in furtherance of efforts to aggrandize themselves and injure the Fallen Officer Foundation. For example, after the July 7 attack, one organization with whom the Fallen Officer Foundation had worked to secure a $25,000 donation for the families of the five fallen was told by the ATO that the ATO was exclusively in charge of collecting all donations for the families. On information and belief, this false statement was made by the ATO on a telephone call. As a result, this organization turned over their donation to the ATO rather than the Fallen Officer Foundation as planned. Only Defendants know how many other relationships they have torpedoed to injure the Fallen Officer Foundation.

43.     And as recently as March 29, 2018, the DPA's president circulated an email to all DPA members in which he made a false allegation of "co-mingling" Fallen Officer Foundation and Lodge #588 funds, and the allegation of "co-mingling" is particularly outrageous given the ATO's unlawful depositing of donations belonging to others into its own bank account, and Frazier's prior misrepresentations in television interviews that the ATO's collection of donations after the July 7 attack were being "audited". Notably, the DPA's lie about "co-mingling" occurred after it had given up on its plan to taking over Lodge #588 and thereby eliminating the Fallen Officer Foundation, which shows its misconduct is likely to continue.

44.     Indeed, on information and belief, when a law enforcement officer is tragically killed in the line of duty, Defendants conspire with others to slander the Fallen Officer Foundation as part of their continuing scheme to attempt to maintain the ATO's status as a reputable charitable organization. The most recent example occurred after a Dallas Police Officer was killed in the line of duty in April 2018. The Fallen Officer Foundation worked with one of its supporters to develop a "t-shirt" campaign to raise donations for this officer's family. Thereafter, an individual associated with the ATO, whose wife is a DPA member, went to social media calling for everyone to boycott

the Fallen Officer Foundation's fundraiser, accusing the fundraiser as "using a fallen officer to make money," and accusing the Fallen Officer Foundation's supporter as being a "company of sell outs that profit through blood money."

45.     Defendants have shown they will use any means necessary to enrich themselves. Enough is enough.

## CAUSES OF ACTION

### Count 1: Civil RICO (Frazier, ATO, and DPA)

46.     The Fallen Officer Foundation incorporates by reference the preceding paragraphs.

47.     Defendants have engaged in a pattern of racketeering activity connected to the conduct and control of an enterprise.

48.     Defendants have committed two or more predicate acts that are related and amount to or pose a threat of continued criminal activity.

49.     Such predicate acts arise out of violations of: the National Stolen Property Act, 18 U.S.C. § 2314; 18 U.S.C. § 1708, barring theft or receipt of stolen mail; 18 U.S.C. § 1956, prohibiting laundering of monetary instruments; 18 U.S.C. § 1957, prohibiting engaging in monetary transactions in property derived from specified unlawful activity; and 18 U.S.C. § 1343, barring fraud by wire, radio, or television.

50.     Defendants' misconduct occurred over a substantial period of time, not a period of only a few weeks or months and threatening no future criminal conduct.

51.     Numerous individuals and entities have been injured by Defendants' misconduct.

52.     There is a specific threat of repetition of Defendants' misconduct extending indefinitely into the future.

53.     There is no reason to suppose that Defendants' misconduct will not continue but for the Fallen Officer Foundation's filing of this lawsuit.

54.     Frazier and the DPA participated in or conducted the affairs of an enterprise—the ATO—through a pattern of racketeering activity, and thereby violated 18 U.S.C § 1962(c).

55.     Frazier, the ATO, and the DPA agreed to commit predicate acts, including entering into the unlawful Donations Management Agreement, removing donations from seized mail that had been directed to the Fallen Officer Foundation, depositing donations belonging to the Fallen Officer Foundation, concealing their misappropriation of donations taken from the mail, and lying to at least one third party using wires for the purpose of diverting donations to the ATO from the Fallen Officer Foundation. Defendants therefore violated 18 U.S.C. § 1962(d).

56.     The Fallen Officer Foundation was injured by reason of the Defendants' violations of 18 U.S.C. §§ 1962(c) and 1962(d).

57.     The Fallen Officer Foundation seeks threefold its sustained damages pursuant to 18 U.S.C. § 1964(c).

### Count 2: Violations of the Texas Theft Liability Act (ATO)

58.     The Fallen Officer Foundation incorporates by reference the preceding paragraphs.

59.     The Fallen Officer Foundation was entitled to possession of the checks and donations made directly to it through title to the personal property and a greater right of possession than the ATO.

60.     The ATO unlawfully appropriated the Fallen Officer Foundations donations with an intent to deprive it of those donations and without its consent. *See* TEX. PENAL CODE § 31.03. To the Fallen Officer Foundation's current knowledge, the value of its stolen property was between $2,500 and $30,000. *Id.* § 31.03(e)(4). Because the ATO was a public servant at the time of the offense, the theft constitutes a third-degree felony. *Id.* § 31.03(f)(1).

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                **Page 13**

61.     The Fallen Officer Foundation sustained damages as a result. It seeks its actual damages, additional statutory damages of $1,000, attorneys' fees and expenses, pre- and post-judgment interest, court costs, and exemplary damages.

### Count 3: Tortious Interference (Frazier and ATO)

62.     The Fallen Officer Foundation incorporates by reference the preceding paragraphs.

63.     As described in detail above, Defendants have by tortious means, intentionally interfered with and prevented the Fallen Officer Foundation from receiving donations from third parties that it otherwise would have received.

64.     Defendants' wrongful acts and omissions were intentional, willfully negligent, or done with conscious indifference or reckless disregard for the safety of others.

65.     Defendants' tortious interference caused the Fallen Officer Foundation injury. The Fallen Officer Foundation seeks its actual damages, pre- and post-judgment interest, court costs, and exemplary damages.

### Count 4: Money Had and Received (ATO)

66.     The Fallen Officer Foundation incorporates by reference the preceding paragraphs.

67.     As described in detail above, the ATO held and holds money that, in equity and good conscience, belonged to the Fallen Officer Foundation.

68.     The Fallen Officer Foundation is entitled to recover all actual damages it suffered as a result of the ATO's holding of stolen donations. It seeks these actual damages as well as pre- and post-judgment interest, court costs, and exemplary damages.

### Count 5: Unjust Enrichment (ATO)

69.     The Fallen Officer Foundation incorporates by reference the preceding paragraphs.

70.     The ATO wrongfully secured benefits through its retention of funds donated to the Fallen Officer Foundation, and that were intended to be charitably donated to the Fallen Officer Foundation.

71.     The ATO's unjust enrichment caused the Fallen Officer Foundation damages.

### Count 6: Civil Conspiracy (ATO and DPA)

72.     The Fallen Officer Foundation incorporates by reference the preceding paragraphs.

73.     Each Defendant was a member of a combination of two or more persons.

74.     The object of the combination was to accomplish unlawful purposes and lawful purposes by unlawful means.

75.     The members had a meeting of the minds on the object or course of action.

76.     At least one Defendant committed at least one unlawful, overt act to further the object or course of action.

77.     The Fallen Officer Foundation suffered an injury as a proximate result of at least one wrongful act.

78.     Each Defendant is therefore jointly and severally liable for all acts done by any of them in furtherance of the unlawful combination.

### INJUNCTIVE RELIEF

79.     The Fallen Officer Foundation incorporates by reference the preceding paragraphs.

80.     The Fallen Officer Foundation seeks all injunctive relief to which it is entitled under 18 U.S.C. 1964(a), including but not limited to: an order requiring Frazier to divest himself of any interest, direct or indirect, in the ATO or DPA; and an order requiring the DPA to divest itself of any interest, direct or indirect, in the ATO.

## EXEMPLARY DAMAGES

81.     The Fallen Officer Foundation incorporates by reference the preceding paragraphs.

82.     The Fallen Officer Foundation seeks exemplary damages as outlined above.

83.     The Fallen Officer Foundation is entitled to exemplary damages because harm to it resulted from Defendants' fraud and malice.

84.     The limitation on exemplary damages established by TEX. CIV. PRAC. & REM. CODE § 41.008(b) is inapplicable because the Fallen Officer Foundation seeks exemplary damages based on conduct described as a felony in the following sections of the Penal Code, and the conduct was committed knowingly or intentionally: Section 32.45 (misapplication of fiduciary property or property of financial institution) and Chapter 31 (theft) the punishment level for which is a felony of the third degree or higher.

## ATTORNEYS' FEES

85.     The Fallen Officer Foundation incorporates by reference the preceding paragraphs.

86.     The Fallen Officer Foundation is entitled to fees under the RICO statute, 18 U.S.C. § 1964(c).

87.     The Fallen Officer Foundation retained counsel to represent it in this action and agreed to pay the firm reasonable and necessary attorneys' fees. The Fallen Officer Foundation is entitled to recover its attorneys' fees under TEX. CIV. PRAC. & REM. CODE § 134.005.

## DEMAND FOR JURY TRIAL

88.     The Fallen Officer Foundation demands a trial by jury.

## PRAYER FOR RELIEF

The Fallen Officer Foundation prays that the Court enter judgment awarding it the following relief:

**PLAINTIFF'S ORIGINAL COMPLAINT**                                          **Page 16**

A.      Actual damages;

B.      Statutory damages, including treble damages under 18 U.S.C. § 1964(c);

C.      An accounting of donations misappropriated by the ATO;

D.      Attorneys' fees and expenses;

E.      Costs;

F.      Exemplary damages (uncapped as described above);

G.      Pre- and post-judgment interest; and

H.      All other relief it is entitled to.


Dated:  July 6, 2018                        Respectfully submitted,

**GRIFFITH BARBEE PLLC**

*/s/ Casey Griffith*
Casey Griffith
Texas Bar No. 24036687
Casey.Griffith@griffithbarbee.com
----
Michael Barbee
Texas Bar No. 24082656
Michael.Barbee@griffithbarbee.com
----
Katherine Weber
Texas Bar No. 24045445
Katherine.Weber@griffithbarbee.com

Highland Park Place
4514 Cole Avenue, Suite 600
Dallas, Texas 75205
214-446-6020 | Main
214-446-6021 | Fax

**COUNSEL FOR PLAINTIFF**