# United States District Court
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| DALLAS FALLEN OFFICER FOUNDATION | § § | |
| Plaintiff, | § § | Civil Action No. 4:18-CV-00481 |
| v. | § § | Judge Mazzant |
| FREDERICK FRAZIER, DPA's ASSIST THE OFFICER FOUNDATION, INC. and DALLAS POLICE ASSOCIATION, Defendants. | § § § § § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion to Sanction Defendant Dallas Police Association for Discovery Abuses Pursuant to Rule 37(b)(2)(A) (Dkt. #43). Having considered the motion and the relevant pleadings, the Court finds that Plaintiffs' Motion is **GRANTED in part & DENIED in part**.

## BACKGROUND

Dallas Fallen Officer Foundation (the "FOF") is a Texas nonprofit corporation that provides support and assistance to "the families of police officers killed or seriously injured in the line of duty" (Dkt. #1). While the FOF often responds to the tragic circumstances that surround a fallen officer, the FOF is not alone (Dkt. #1; Dkt. #25). For instance, after the July 7, 2016 sniper attack in downtown Dallas, Texas, the FOF was one of "three charitable organizations to whom the Dallas Police Department directed the public to donate" (Dkt. #1). One of the other charitable organizations designated to receive donations was the Assist the Officer Foundation (the "ATO") (Dkt. #1; Dkt. #25). The ATO, unlike the FOF, serves as a separate entity of the Dallas Police

Association (the "DPA") (Dkt. #1). Although both the FOF and ATO exist to provide charitable services, such charity clearly does not extend to one another.

The FOF and ATO are entangled in what can be described as nothing short of a turf war. On July 6, 2018, that turf war reached its height when the FOF filed the present action against the ATO, DPA, and Frederick Frazier—the Chairman of the ATO and First Vice President of the DPA (Dkt. #1). The FOF claims that the ATO, DPA, and Frazier have "embarked on a scheme to expand their power within and outside Texas by affiliating the DPA and the ATO with an organization known as the Fraternal Order of Police ("FOP") . . ." (Dkt. #1). Put simply, the FOF claims that it has become the ATO's mission to "annihilate" the FOF and create a "monopoly over charitable fundraising for fallen officers" (Dkt. #1). To succeed in this purported scheme, the FOF maintains that Frazier, the ATO, and the DPA engaged in a number of illegal acts (Dkt. #1).

The FOF points to four alleged incidents—or illegal acts—to substantiate its allegations. First, the FOF asserts that the City of Dallas and the ATO entered into an unlawful Donations Management Agreement (Dkt. #1). Under the alleged agreement, the City would intercept and deliver mail to the ATO so that the ATO could deposit the funds into its bank account, regardless of who the donations were for. The agreement occurred only after the DPA was unsuccessful in an attempted merger between the DPA and the FOP—another alleged attempt to "annihilate" the FOF according to the Complaint (Dkt. #1). Second, the FOF asserts that the ATO removed donations from the seized mail, some of which had originally been directed to the FOF, and then deposited those donations into the ATO's account without the FOF's consent (Dkt. #1). This resulted in the alleged misappropriation of over $5,000 belonging to the FOF (Dkt. #1). Third, the FOF asserts that the ATO concealed its theft for over 18 months, despite knowing that each donation was made payable to a party other than the ATO (Dkt. #1). Finally, the FOF asserts that

the ATO lied to "at least one third party using wires for the purpose of diverting donations to the ATO from the [FOF]" (Dkt. #1). The DPA, ATO, and Frazier deny all of the FOF's assertions (Dkt. #25) and further maintain that the FOF simply has "no evidence of its claims" (Dkt. #47). As a result of the FOF's assertions, the FOF brought six claims against the various defendants. Those claims include: (1) Civil RICO under 18 U.S.C. § 1962(c), (d);[1] (2) violations of the Texas Theft Liability Act;[2] (3) tortious interference; (4) money had and received; (5) unjust enrichment; and (6) civil conspiracy (Dkt. #1).

On September 6, 2018, the Court issued the Order Governing Proceedings (Dkt. #12). In the Order, the Court instructed the parties to produce "[a] copy of all documents, electronically stored information, witness statements, and tangible things in the possession, custody, or control of the disclosing party that are relevant to the claim or defense of any party" (Dkt. #12). Such production was to be accomplished not later than 10 days after the deadline for the Rule 26(f) conference (Dkt. #12). The Order, pursuant to Local Rule CV-26(d), defined "relevant" as including:

> (1) information that would not support the disclosing parties' contentions; (2) those persons who, if their potential testimony were known, might reasonably be expected to be deposed or called as a witness by any of the parties; (3) information that is likely to have an influence on or affect the outcome of a claim or defense; (4) information that deserves to be considered in the preparation, evaluation, or trial of a claim or defense; and (5) information that reasonable and competent counsel would consider reasonably necessary to prepare, evaluate, or try a claim or defense

(Local Rule CV-26(d)). The Court then entered its Scheduling Order (Dkt. #18) on November 2, 2018. In the Scheduling Order, the Court stated:

---

[1] The FOF asserts that the following statutes were violated as the predicate crimes for its RICO claim: (1) the National Stolen Property Act, 18 U.S.C. § 2314 (prohibiting the transportation or transfer of stolen goods, securities, moneys, stamps, or articles); (2) 18 U.S.C. § 1708 (prohibiting theft or receipt of stolen mail); (3) 18 U.S.C. § 1956 (prohibiting laundering of monetary instruments); (4) 18 U.S.C. § 1957 (prohibiting engaging in monetary transactions in property derived from specified unlawful activity); and (5) 18 U.S.C. § 1343 (prohibiting fraud by wire, radio, or television).
[2] *See* TEX. PENAL CODE § 31.03.

> If the parties are unable to resolve the dispute without court intervention, the parties must then call the Court's chambers to schedule a telephone conference regarding the subject matter of the dispute prior to filing any motion to compel. After reviewing the dispute, the Court will resolve the dispute, order the parties to file an appropriate motion, or direct the parties to call the discovery hotline

(Dkt. #18). Despite the Courts entry of both Orders, the turf war has only escalated.

On May 29, 2019, the FOF "served notice on the DPA that it intended to depose the DPA pursuant to Rule 30(b)(6). The notice set forth 12 discreet topics . . . ." (Dkt. #43) (citation omitted). Of those topics, Topic 2 stated that the DPA's Rule 30(b)(6) representative should be ready to testify about the efforts undertaken by the DPA to produce all documents relevant to the lawsuit (Dkt. #43).[3] Up to this time, the DPA had produced 148 pages of documents (Dkt. #43; Dkt. #47). Further, no discovery disputes had occurred (Dkt. #47). On June 26, 2019, the FOF amended its notice and moved the deposition to accommodate schedules (Dkt. #43). Topic 2 remained the same (Dkt. #43). The DPA then served the FOF with 1,079 documents between June 28, 2019 and July 3, 2019 (Dkt. #43). Those documents included, among other things: (1) 91 pages of non-party meeting transcripts; (2) 269 pages of the DPA's Executive Board GroupMe screenshots—which, according to the DPA, are irrelevant and/or duplicates that had been requested by the FOF; and (3) an undisclosed number of screenshots of the DPA's entire public Facebook page which had also been requested by the FOF (Dkt. #47). This occurred after the FOF initiated "its first communication regarding the DPA's document production, demanding native files of the GroupMe posts and the *entire* Facebook page . . . ." (Dkt. #47). After receiving these documents, the FOF amended its notice a second time, added four new topics based on the new

---

[3] The exact text of Topic 2 is as follows:
> Efforts undertaken by you to search for, locate, collect, secure, obtain, and produce Documents to Plaintiff in your possession, custody, or control that are relevant to the claims or defenses of any party to this Lawsuit, including: (i) methods employed to search for and identify such Documents; (ii) the time period covered by your search; (iii) each custodian of records interviewed or searched relating to the Documents; and (iv) the identity of each individual who conducted such interviews or searches

(Dkt. #43).

documents produced by the DPA, and set the deposition date for July 8, 2019 (Dkt. #43). Consequently, the DPA designated Michael Mata ("Mata"), DPA's President, to serve as its Rule 30(b)(6) representative (Dkt. #43; Dkt. #47).

Mata's deposition lasted for one hour and twenty-two minutes (Dkt. #43; Dkt. #47). Despite having notice of the deposition, Mata was unable to conclusively answer many of the FOF's questions regarding Topic 2 (Dkt. #43). As a result of the FOF's perception that Mata was unprepared, the FOF and DPA agreed to suspend the deposition (Dkt. #43; Dkt. #47). Only Topic 2 had been addressed (Dkt. #43; Dkt. # 47). Further, the FOF had not called "the Court's Chambers or the discovery hotline" (Dkt. #47). After the deposition, the DPA produced over 1,000 pages of documents, photos, and video files (Dkt. #43). The documents consisted of screenshots of the "entire DPA public Facebook and Twitter pages (open to the public)" which were "downloaded and provided to all parties at the DPA's cost as a courtesy" (Dkt. #47). This was the second time the DPA provided the Facebook screenshots (Dkt. #47). On July 12, 2019, "the FOF's counsel and the DPA's counsel engaged in an extensive tele-conference to discuss the DPA's document production and how to proceed . . . ." (Dkt. #43). Yet again, the FOF did not call the Court's Chambers or the discovery hotline (Dkt. #47). Rather, on July 17, 2019, two days prior to discovery closing, the FOF filed its Motion to Sanction Defendant Dallas Police Association for Discovery Abuse Pursuant to Rule 37(b)(2)(A) (Dkt. #43; Dkt. #47).

In its Motion, the FOF requests that the Court stay the case pursuant to Rule 37(b)(2)(A), order the DPA to certify that it has complied with the Court's Order Governing Proceedings, grant the FOF its full seven hours to depose the DPA's Rule 30(b)(6) representative(s) once the DPA certifies it has complied with the Court's Order," and require the parties to jointly file a proposed amended scheduling order (Dkt. #43). The DPA, unsurprisingly, opposes this Motion. The Court

now considers the FOF's Motion to Sanction Defendant Dallas Police Association for Discovery Abuse Pursuant to Rule 37(b)(2)(A).

## LEGAL STANDARD

Rule 37(b)(2)(A) explicitly provides that:

> If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders

FED. R. CIV. PRO. 37(b)(2)(A). From a plain reading of Rule 37(b)(2)(A)'s text, it is abundantly clear that a district court has broad discretion in fashioning orders to rectify violations of discovery orders. *Id.* Indeed, the only explicit limitation on a court under Rule 37(b)(2)(A) is that the court's order, or imposition of sanctions, be "just." Stephen E. Arthur & Robert S. Hunter, § 5:14 *Discovery*, Federal Trial Handbook Civil (4th Ed.). The Fifth Circuit has interpreted Rule 37(b)(2)(A) identically. According to the Fifth Circuit, Rule 37(b)(2)(A) "authorizes courts to appropriately respond to and deal with parties which have disobeyed discovery orders." *Chilcutt v. U.S.*, 4 F.3d 1313, 1319–20 (5th Cir. 1993) (citing *Batson v. Neal Spelce Associates, Inc.*, 765 F.2d 511 (5th Cir. 1985); *Marshall v. Segona*, 621 F.2d 763 (5th Cir. 1980); *Emerick v. Fenick Industries, Inc.*, 539 F.2d 1379 (5th Cir. 1976)). Yet, while a district court is afforded broad discretion, such discretion is not unlimited—"constitutional safeguards must be protected." *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 212 (1958). Accordingly, while sanctions are an appropriate response to violations of discovery orders, a court must not abuse the discretion afforded to it. *See, e.g., National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642 (1976) (per curiam) ("[T]he question presented to us is not whether we would have imposed the same sanction as the district court; it is whether the district court abused its discretion in imposing that sanction."); *Topalian v. Ehrman,*

3 F.3d 931, 934 (5th Cir. 1993); C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2284, at 765 (1970). As the Court has previously stated, "[w]hether deterrence or compensation is the goal, the punishment should be reasonably suited to the crime.'" *Slabisak v. University of Texas Health Science Center at Tyler*, 2018 WL 4842690, at *1 (E.D. Tex. Oct. 4, 2018) (citing *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 618 (S.D. Tex. 2010)).

## ANALYSIS

The FOF claims that the DPA failed to comply with the Court's Order Governing Proceedings and further failed to properly prepare its 30(b)(6) witness. Consequently, the FOF requests that the Court sanction the DPA by: (1) staying the case pursuant to Rule 37(b)(2)(A); (2) ordering the DPA to certify that it has complied with the Court's Order Governing Proceedings; (3) granting the FOF its full seven hours to depose the DPA's Rule 30(b)(6) representative(s); and (4) requiring that the parties jointly file a proposed amended scheduling order. The DPA counters that it has complied with its disclosure obligations and that the FOF has failed to act diligently in raising its discovery concerns. To determine whether to grant the FOF's Motion, and to thus sanction the DPA, the Court must consider each ground for a Rule 37(b)(2)(A) sanction separately. Accordingly, Part I of this opinion will address the FOF's request for sanctions pursuant to Rule 26(f). Part II will then address the FOF's request for sanctions pursuant to Rule 30(b)(6).

### I. Rule 37(b)(2)(A) Sanctions Under Rule 26(f)

Rule 26 "has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition." *Crosby v. Louisiana Health Service and Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011) (citing *Murphy v. Deloitte & Touche Group Ins.*, 619 F.3d 1151, 1163 (10th Cir. 2010)); *see also Crawford–El v. Britton,* 523 U.S. 574, 598 (1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly."). Thus, a district court must always be mindful of

7

the discovery parameters it sets.  *Id.*  This same mindfulness should be applied when sanctioning parties for Rule 26 violations.  As the Fifth Circuit has stated:

> The following factors should guide a districts court's exercise of its discretion to impose sanctions for a discovery violation: '(1) the reasons why disclosure was not made; (2) the amount of prejudice to the opposing party; (3) the feasibility of curing such prejudice with a continuance of the trial; and (4) any other relevant circumstances'

*U.S. v. Dvorin*, 817 F.3d 438, 453 (5th Cir. 2016) (quoting *States v. Garrett*, 238 F.3d 293, 298 (5th Cir. 2000).  Analysis of these factors requires a district court to engage in a "fact-intensive inquiry."  *Id.* (citing *Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001)).  Also included in this analysis is whether the party moving for sanctions complied with a court's previous orders concerning discovery disputes.  *See Slabisak v. University of Texas Health Science Center at Tyler*, 2018 WL 4842690, at *3 (E.D. Tex. Oct. 4, 2018) ("[i]f the parties would have notified the Court of the issues presented earlier, the Court likely could have resolved the issues through the discovery dispute process detailed in the Scheduling Order—without the need to consider sanctions.").  Ultimately, whatever sanctions a court chooses to impose "should be the least severe penalty necessary to ensure compliance with the court's discovery orders."  *Dvorin*, 817 F.3d at 453.

Here, the FOF seeks sanctions against the DPA alleging that the DPA increased "its document production by a factor of 7" in the days leading up to the July 8 deposition, refused to respond to the FOF's questions concerning certain documents, and "did not search for documents in its possession, custody, or control relating to Frazier" (Dkt. #43).  Two issues are critical to the Court's analysis of whether to impose sanctions.  First, the discovery disputes themselves.  And second, the FOF's failure to abide by the Court's Scheduling Order (Dkt. #18).  The Court addresses each of these in turn.

### a. The Discovery Disputes

As previously stated, the FOF cites three discovery disputes to support its Motion. Each of these disputes are addressed separately under the *Dvorin* factors.

#### i. Production of Documents Pre- & Post-Deposition

According to the FOF, the DPA only produced a total of 148 pages of documents prior to May 29, 2019 (Dkt. #43; Dkt. #47). After receiving notice of the deposition of its 30(b)(6) representative, the DPA then served the FOF with 1,079 documents (Dkt. #43). Following the July 8 deposition, the DPA produced over 1,000 pages of documents, photos, and video files (Dkt. #43). While this may seem shocking at first glance, a mere comparison of the figures fails to reveal the entire picture. Indeed, while the FOF implicitly alleges that the DPA engaged in sandbagging, any such argument is a mischaracterization. For instance, the FOF complains that the day after Mata's deposition, the DPA "produced an additional 720 pages of documents and 600 photo and video files relevant to the claims and defenses in this lawsuit" (Dkt. #43). What the FOF fails to reference in its Motion, however, is its request for the very documents in question (Dkt. #47, Exhibit 7). The 1,000 plus documents the FOF complains of consist of the screenshots of the "entire DPA public Facebook and Twitter pages (open to the public)" which were "downloaded and provided to all parties at the DPA's cost as a courtesy" (Dkt. #47). This was the second time the DPA provided the Facebook screenshots (Dkt. #47). Additionally, prior to the July 8 deposition, the DPA provided, among other things, screenshots of the same Facebook page and 269 pages of the DPA's Executive Board GroupMe screenshots—which, according to the DPA, are irrelevant and/or duplicates that had been requested by the FOF. *See* Dkt. #47 (stating that the FOF had demanded "native files of the GroupMe posts and the *entire* Facebook page . . . ."). While inundating an opposing party with documents during discovery

may not be best practice, it is certainly not sanctionable. To be sure, the FOF does not prevail under a single *Dvorin* factor with these facts. *Dvorin*, 817 F.3d at 453. Disclosures were made to the FOF, those disclosures were provided within the time for discovery—albeit, in large quantities, the DPA was simply complying with requests for documents, and the FOF was not prejudiced by receiving the production *it requested*. *Id.* Moreover, the FOF mischaracterized the document production in its Motion to imply that production by the DPA was malicious. *See* Dkt. #43, at pp. 4–5 (" . . . thereby, increasing its document production by a factor of 7 in the mere days leading up to the DPA's deposition."); Dkt. #43, at p. 10 (" . . . which more than doubled the DPA's entire document production in this action."). Mischaracterizing another party's document production is certainly not a way to persuade the Court to grant sanctions. Accordingly, the Court finds that no sanctions are warranted for this particular dispute under the *Dvorin* factors.

### ii. Timing of Discovery

With regard to the DPA's alleged failure to respond to "the FOF's questions regarding when certain persons associated with the DPA were asked to search for responsive documents," the FOF does not support its contentions (Dkt. #43). Rather, the FOF provides general assertions, unsupported by any specific evidence of requests or responses (Dkt. #43). On the contrary, the DPA outlines how it conducted discovery in its Response and supports its assertions with a notarized affidavit of their officer manager, Jennifer Brown (Dkt. #47, Exhibit 5). Thus, a *Dvorin* analysis would simply be a pedagogical exercise at this point. Even if the DPA were to provide support for its contentions, however, the Court again points to the DPA's decision to not bring such a dispute before the Court prior to filing a motion for sanctions.[4]

---

[4] As discussed, *infra*, the Scheduling Order is entered to provide parties with an efficient means to resolve discovery disputes. The Order is an affirmative command; not a suggestion.

Sanctions should be a step of last resort, not a party's first response. *See infra* Part I.b; *see also Dvorin*, 817 F.3d at 453 (stating that sanctions "should be the least severe penalty necessary to ensure compliance with the court's discovery orders."). Again, the Court finds no sanctionable conduct here.

### iii. Production Concerning Frazier

In support of its claim that the DPA has not met its burden to search for documents concerning Frazier, the FOF states that it "has real concerns the DPA has not searched for or produced relevant documents in its possession, custody, or control merely because those documents relate to Frazier" (Dkt #43). Concern, however, is not enough to support sanctions. *See Dvorin*, 817 F.3d at 453. The DPA is well aware of its requirements under the Order Governing Proceedings (Dkt. #12) and the definition of what is defined as "relevant" under Local Rule CV-26(d). Moreover, Frazier is independently represented. While this does not shield the DPA from complying with producing any discoverable documents in its possession that are related to Frazier, Frazier's independent representation does mean that the FOF should have directed its discovery concerns to Frazier, too. The fact that Frazier is independently represented, his attorneys, rather than the DPA, have personally handled all "document searching, culling, coordination and production," and the FOF chose not to bring this dispute before the Court, or alert Frazier, prior to its Motion to Sanction all weigh against finding in favor of the FOF. *Dvorin*, 817 F.3d at 453. Consequently, Court finds no sanctionable conduct here.

### b. The Scheduling Order

Even if the FOF had demonstrated some questionable conduct on the DPA's part, the Court would still not find sanctions appropriate here. *See Dvorin*, 817 F.3d at 453. Under the

Court's Scheduling Order, the parties were informed that, "[i]f the parties are unable to resolve the dispute without court intervention, the parties must then call the Court's chambers" (Dkt. #18). The Court's Scheduling Order is clear. Calling the Court was not a suggestion or a request; it was an affirmative command. Thus, even if the FOF had established a 26(f) violation, the FOF violated an Order itself. Concerns about discovery disputes should not be addressed to the Court for the first time through a motion to sanction the other party. Let alone when there have been no discovery disputes up until the present dispute.[5] And here, that is exactly the case. Prior to the July 8 deposition, no assertion had been made and no motion had been filed alerting the Court to any discovery dispute. Yet, despite not alerting the Court when a discovery dispute eventually arose, the FOF contends that it is still entitled to the relief it seeks. Indeed, the FOF contests the simple notion that it comply with the Court's Order when it states: "The DPA's Response . . . asserts that the FOF should have filed a motion to compel or called the Court's discovery hotline. Such an assertion is inapposite and intended to distract from the DPA's sanctionable conduct" (Dkt. #53). The DPA's Response, however, is far from inapposite. On the contrary, the Response is directly on point. The Scheduling Order is entered to allow the Court to aid parties in quickly resolving discovery disputes and to thus prevent drawn out disputes like the present one. As the Court has stated before, "[i]f the parties would have notified the Court of the issues presented earlier, the Court likely could have resolved the issues through the discovery dispute process detailed in the Scheduling Order—without the need to

---

[5] The FOF relies on *Chilcutt* for the proposition that the Court may enter a sanctions order against the DPA (Dkt. #43). Reliance on *Chilcutt*, however, proves to be a two-edged sword. In *Chilcutt*, a district court imposed Rule 37 sanctions on an Assistant United States Attorney ("AUSA") after the AUSA "disobeyed the district court's order to fulfill its discovery obligations and attempted to deceive the court and the plaintiff." *Chilcutt*, 4 F.3d at 1315. The conduct there was so egregious that "the district court considered Mr. Means' behavior to be *so* willful and contumacious that it seriously considered disbarring Mr. Means and holding him in criminal contempt." *Id.* at 1322–23. Such conduct is certainly not present here. Thus, rather than supporting the FOF's motion, *Chilcutt* serves as a reminder that sanctions are a serious affair that are to be used only in the most volatile of situations.

consider sanctions." *Slabisak*, 2018 WL 4842690, at *3. Yet, no such chance was given here. Thus, irrespective of the FOF's contentions in the individual discovery disputes—not including the deposition of the 30(b)(6) representative—the Court is not inclined to grant the FOF's motions. Accordingly, the FOF's Motion for Sanctions under Rule 26(f) is denied.

## II. Rule 37(b)(2)(A) Sanctions Under Rule 30(b)(6)

Under Rule 30(b)(6), "a party may name as the deponent a public or private corporation." FED. R. CIV. PRO. 30(b)(6). If a party chooses to name a public or private corporation, "[t]he named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf . . . . The persons designated must testify about information known or reasonably available to the organization." *Id.* Simply designating an officer or director to attend the deposition on behalf of the corporation, however, is not sufficient. According to the Fifth Circuit, the deponent "must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to *prepare* those persons in order that they can answer fully, completely, unevasively, the questions posed . . . as to the relevant subject matters." *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (citing *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y. 1997) (citations omitted) (emphasis added); *see also Gucci Am., Inc. v. Costco Cos.*, 2000 WL 60209, at *3 (S.D.N.Y. Jan. 24, 2000); *SEC v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y. 1992); *FDIC v. Butcher*, 116 F.R.D. 196 (E.D. Tenn. 1986); *Mitsui & Co. (U.S.A.), Inc. v. P.R. Water Res. Auth.*, 93 F.R.D. 62, 67 (D.P.R. 1981)). Put another way, "[t]he duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved. The deponent must prepare the designee to the extent matters are

reasonably available, whether from documents, past employees, or other sources." *Id.* Should a 30(b)(6) deponent be unprepared, a court is "empowered to use any of the remedies available under [] Fed. R. Civ. P. 37(d) . . . ." *Robroy Indus. - Texas, LLC v. Thomas & Betts Corp.*, 2016 WL 325175, at *2 (E.D. Tex. Jan. 27, 2016) (citing *Resolution Trust Corp. v. S. Union Co.*, 985 F.2d 196, 198 (5th Cir. 1993).

Here, the FOF seeks sanctions against the DPA alleging that the DPA's 30(b)(6) representative—Michael Mata—was unprepared for his deposition. Having reviewed the deposition transcript and the relevant pleadings, it is readily apparent that Mata was unprepared for the July 8 deposition. The FOF sent the DPA notice of the deposition on May 29, 2019, alerting the DPA that a deposition of its Rule 30(b)(6) representative would occur on June 12, 2019. Even after subsequent amendments to the deposition date—amendments which favored the DPA by providing it nearly an additional month to prepare its representative—the DPA still failed to adequately prepare its representative. A review of the deposition transcript here is instructive.

The deposition transcript is littered with shortcomings by the DPA. Even a cursory review of the transcript reveals that Mata attended the deposition armed with a simple phrase: "I don't know." This three-word phrase, or its equivalent, was used by Mata *over* 25 times in the short, one hour and twenty-two-minute deposition (Dkt. #43, Exhibit D; Dkt. #47, Exhibit 2). 28 times to be exact (Dkt. #43, Exhibit D; Dkt. #47, Exhibit 2). The breadth of the DPA's failure to prepare its witness is encapsulated in an exchange that occurred late in the deposition. When asked, "[i]t's fair to say that you have no idea what text messages were searched for other than the ones you looked for, correct []," Mata simply, yet tellingly replied, "that is correct" (Dkt. #43, Exhibit D, at p.40). Notably, when Mata was prepared to respond, the questions

14

generally revolved around personally relevant matters, such as Mata's personal email accounts, or matters that Mata specifically oversaw. For example, the longest, most-detailed exchange, occurred when Mata discussed the Department's barbecue team (Dkt. #43, Exhibit D, at pp. 43–46). On the contrary, Mata was unable to respond when questioned about, among other things: who was involved in gathering GroupMe communications or what keywords were used in the search; whose emails were searched; who was asked to search for text messages; whether the DPA's Twitter Account was searched; what was searched for on the DPA's public Facebook page; or whether the DPA's closed Facebook page was searched (Dkt. #43, Exhibit D). Moreover, Mata admitted that he did not review a single document to prepare for the deposition and only met with his attorney for a total of two hours and ten minutes prior to the deposition (Dkt. #43, Exhibit D, at pp. 9–10).

While Mata was able to discuss his personal emails and the Department's barbecue team, Mata's ability to discuss personal matters is irrelevant. Mata was not at the deposition to testify *personally*, he was there as the DPA's 30(b)(6) *corporate representative*. Thus, it is not enough that Mata was prepared to discuss matters personally known to him, for "[t]he duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee." *Brazos River Authority*, 469 F.3d at 433. Mata, through the DPA, was notified that he had to be prepared to discuss Topic 2, the very Topic he was unable to discuss.[6] This inability makes it all but clear that the DPA and Mata did not put forth a conscientious, good-faith endeavor when preparing for the July 8 deposition. *Id.*

---

[6] The DPA further attempts to hide behind its attorneys in footnote 22 of its Response by claiming that the FOF was aware that the "attorneys were the ones looking at the GroupMe threads" and thus Mata did not know what was involved (Dkt. #47). Yet this argument misses the point. Mata and the DPA cannot hide behind the phrase "I don't know." As the DPA's 30(b)(6) representative, Mata's job, simply put, was to know. *See Brazos River Authority*, 469 F.3d at 433 (stating the deponent "must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to *prepare* those persons in order that they can answer fully, completely, unevasively, the questions posed . . . as to the relevant subject matters.").

Finally, in one last Hail Mary attempt to demonstrate some form of effort, the DPA cites to an "extensive search[]" conducted by its officer manager as having complied with its discovery requirements (Dkt. #47). Such a search is insufficient to insulate the DPA from fault. As the FOF correctly states, "Mata was the DPA's 30(b)(6) witness, not Brown" (Dkt. #53). Thus, while it is noted that Brown conducted the discovery that the DPA is required to conduct, it is irrelevant for the July 8 deposition. *Id.* The DPA should have prepared *Mata* and it failed to do so. With that being said, the FOF is not without fault.

According to the Court's Scheduling Order, "[i]f the parties are unable to resolve [a] dispute without court intervention, the parties *must* then call the Court's chambers . . . . (Dkt. #18) (emphasis added). Rather than complying with the Court's Orders when the discovery disputes arose, however, the FOF fashioned its own response. As the DPA aptly points out, the FOF "did not follow this Court's specific and mandatory procedure for addressing discovery issues - calling Court Chambers, calling the discovery hotline and/or filing a motion to compel" (Dkt. #47). Rather, "on July 17, 2019 - *two days* before the discovery deadline," the FOF took matters into its own hands and "requested a 'stay' of all proceedings through a 'motion for sanctions' . . . ." (Dkt. #47). This dispute can be summed up by an elementary phrase: Two wrongs do not make a right. The FOF's disregard for the local rules and the Court's Orders is impermissible and heavily effects the judgment of the Court. While the DPA failed to comply with its requirements under the Orders governing this case, the FOF equally failed to comply with the same Orders. Although the parties may be in the midst of their own turf war, that turf war is not permitted in federal court. There is a process for resolving disputes in the Court, and that process is outlined in the Scheduling Order provided to both parties at the outset of this case. It does well for the parties to adhere to it. Indeed, if the FOF had adhered to the Court's Order,

"the Court likely could have resolved the issues through the discovery dispute process detailed in the Scheduling Order—without the need to consider sanctions." *Slabisak*, 2018 WL 4842690, at *3. Accordingly, while the Court agrees that the FOF should receive its full 7 hours to depose Mata due to the DPA's apparent inability to properly prepare its 30(b)(6) representative, the remainder of the relief requested by the FOF, as explained in Part I, *supra*, is denied. *See Robroy Indus. - Texas, LLC*, 2016 WL 325175, at *2.

## CONCLUSION

It is therefore **ORDERED** that Plaintiffs' Motion (Dkt. #43) is **GRANTED in part & DENIED in part**. Accordingly, the FOF shall receive its full seven (7) hours to depose the DPA's Rule 30(b)(6) representative (Dkt. #43). The remainder of the FOF's requested relief, specifically, that the Court stay the case pursuant to Rule 37(b)(2)(A), require the parties to jointly submit a proposed amended scheduling order, and order the DPA to certify that it has complied with the Court's Order Governing Proceedings is **DENIED.**

**IT IS SO ORDERED.**
**SIGNED this 9th day of September, 2019.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE